SELECTMEN OF CLINTON *vs.* WORCESTER CONSOLIDATED
STREET RAILWAY COMPANY.

Worcester. December 4, 1907. — June 16, 1908.

Present : KNOWLTON, C. J., MORTON, HAMMOND LORING, BRALEY
SHELDON, & RUGG, JJ.

*Evidence,* Judicial notice, Admissions and confessions. *Street Railway. Corpora-
tion. Statute. Estoppel. Municipal Corporations,* Officers and agents. *Words,*
" Schools," " Pupils."

This court takes judicial notice of the facts that a corporation, which was organized
since 1864, and which owns and operates a street railway in this Commonwealth,
must have been organized under the laws of this Commonwealth, and that its
organization was not under a special charter.

A street railway corporation was not organized under Pub. Sts. c. 113, §§ 2–8, until,
under § 7, the locations for its tracks had been procured from the aldermen of
the cities and the selectmen of the towns through which the railway was to pass,
" under such restrictions as they " deemed " the interests of the public " might
" require."

A street railway company, which petitioned for, was granted and accepted from
the selectmen of a town under Pub. Sts. c. 113, § 7, a location for its tracks
subject to certain restrictions which at that time were lawful, and thereupon
under § 8 became established as a corporation, having consented to come into
being subject to such restrictions, cannot be heard to complain of them.

It was within the powers of the selectmen of Clinton, on petition under Pub. Sts.
c. 113, § 7, by those intending to organize the Worcester and Clinton Street
Railway Company in 1877, for a grant of location for the company's tracks, to
impose, as a restriction under which the grant should be made, a provision that
the company should " provide to pupils in attendance upon the public schools,
the State Normal School of Worcester, or any school in Worcester, transporta-
tion to such pupils at half price while going to and from school." The franchise
of the corporation, which came into being under § 8 after acceptance of the loca-
tion as granted and before September 30, 1898, was subject to the restriction ;
and such acceptance of the location and subsequent creation of the corporation
must be taken to be an admission by the corporation that the restrictions im-
posed by the selectmen were reasonable and for the public interest.

On petition of those intending to organize the Worcester and Clinton Street Rail-
way Company, the selectmen of Clinton in 1897, under Pub. Sts. c. 113, § 7,
granted a location for the company's tracks, subject to a restriction which
was in the following language : " Said company further agrees to provide to
pupils in attendance upon the public schools, the State Normal School of
Worcester or any school in Worcester, transportation to such pupils at half
price while going to and from school." The grant was accepted and the cor-
poration established under § 8 before September 30, 1898. In accordance with
St. 1897, c. 269, § 1, that company thereafter by deed sold all its property and
franchises to the Leominster and Clinton Street Railway Company, and the latter
to the Worcester Consolidated Street Railway Company, the grantee in each

deed agreeing to assume and perform all obligations and contracts of the grantor. In 1906, the Worcester Consolidated Street Railway Company refused longer to carry upon its cars at a half fare rate students attending the State Normal School, Holy Cross College, and the Worcester Business Institute. Both of the latter institutions were supported by private funds, the former of the two being an institution for higher education, and the latter an institution for the teaching of such subjects as bookkeeping, shorthand, typewriting, commercial law, business and business methods. The selectmen of Clinton by a bill in equity sought a mandatory injunction commanding the company to transport students attending the three institutions from Clinton to the institutions and return at a half fare rate. *Held,* that, as to pupils at the State Normal School at Worcester, the restriction was enforceable against the defendant, and accordingly the mandatory injunction sought with regard to such pupils should issue; but that no injunction should issue as to the transportation of students attending the other two institutions, since they did not come within the description, " pupils . . . in attendance upon any school in Worcester."

BILL IN EQUITY, filed in the Superior Court for the county of Worcester November 7, 1906, for a mandatory injunction commanding the defendant " to provide to pupils in attendance upon the Worcester Normal School, Holy Cross College, Worcester Business Institute or any school in Worcester transportation from Clinton to said schools in Worcester and return at one-half the regular fare, while going to and from school."

Following paragraphs alleging the facts stated in the first paragraph of the opinion, the bill alleged that the defendant's predecessors in title, and the defendant until July, 1906, had provided " to pupils in attendance upon the public schools, the State Normal School in Worcester, Worcester Business Institute, Becker's Business College and Holy Cross College, transportation from Clinton to said schools in Worcester and return at one-half the regular fare while going to and from school." The ninth paragraph, referred to in the next to the last paragraph of the opinion, was as follows: ".9. That said [defendant] since July, 1906, has refused and still refuses to furnish transportation at one-half prices to pupils from Clinton attending schools in Worcester, to wit, Worcester Normal School, Holy Cross College and the Worcester Business Institute, but compels said pupils to pay full fare from Clinton to said schools in Worcester and return, over the location originally granted to said Worcester and Clinton Street Railway Company."

In its answer, the defendant contended that the provision contained in the grant of location by the plaintiff's predecessors to

its predecessor, quoted in the first paragraph of the opinion, was illegal and void and of no effect to bind either the defendant or its predecessors. The answer also alleged that in the deed from its immediate predecessor, the Leominster and Clinton Street Railway Company, there was inserted at the request of the board of aldermen of the city of Worcester, the following provision:

" It is further agreed between the grantor and grantee, in part consideration for this conveyance, that the grantee or Consolidated Company shall transport in its cars in any city or town during the hour immediately preceding the beginning and the hour immediately following the ending of a session of any public school in such city or town (or during such other periods as the board of railroad commissioners may in accordance with law prescribe), any pupil in the public schools whether residing in such or some other city or town and attending such public schools who surrenders a good and valid ticket for which such pupil or some person in his or her behalf has paid to the company one-half the amount of the regular cash fare established for the time being by said company as the fare between the point at which such pupil takes or leaves a car of the company and the public schoolhouse at which such pupil attends school." This provision, the answer alleged, the defendant never had refused to comply with.

There was a hearing before *Gaskill,* J., upon the pleadings and agreed facts. Among the agreed facts, besides those stated in the opinion, were the following:

The provision quoted above appeared in the deed from the Leominster and Clinton Street Railway Company to the defendant, and the defendant " has never refused to comply" with it " unless Holy Cross College, Worcester Business Institute and other educational institutions of a similar character supported by private means, in the territory in which the [defendant] operates, are 'public schools,' and said [defendant] now carries all pupils residing in the town of Clinton attending the public schools of the city of Worcester to and from the schoolhouses in which they attend school and their homes at a fare not exceeding one-half the regular fare charged by it for the transportation of other passengers between said points (unless Holy Cross College, Worcester Business Institute and other educational institutions

of a similar character and supported by private means, situated in the city of Worcester, are public schools)."

The deed from the Worcester and Clinton Street Railway Company to the Leominster and Clinton Street Railway Company, and that from the latter to the defendant, each contained an agreement on the part of the grantee to assume and " perform . . . all leases, contracts, liabilities, obligations and duties of [the grantor] and each and every one of them."

Holy Cross College is an institution for higher education, supported entirely from students' fees, the branches there taught (in the college proper) including among others the following: psychology, natural theology, ethics, cosmology, general metaphysics, criteriology, dialectics, political economy, Latin, Greek, comparative study of dramatic composition, theory of rhetoric, various plays of Shakespeare, history of philosophy, higher mathematics, astronomy, physiological psychology, qualitative analytical chemistry, modern languages, Christian doctrine; and only those professing the Roman Catholic faith apply for admission to said college or become students thereof. The college also maintains a preparatory department, the subjects taught therein including, among others, Latin, Greek, algebra, geometry, Greek and Roman history.

The Worcester Business Institute teaches such special subjects as are calculated to enable its pupils to earn their living in various business occupations, the subjects there taught including among others the following: bookkeeping, shorthand, typewriting, commercial law, business and business office practice. It is supported wholly by private means.

Other facts are stated in the opinion.

The presiding judge reserved the case for consideration by this court.

The case was argued at the bar in December, 1907, before *Knowlton*, C. J., *Morton, Hammond, Braley,* & *Rugg*, JJ., and afterwards was submitted on briefs to all the justices.

*G. E. O'Toole*, for the petitioners.

*B. W. Warren*, (*C. R. Lamson* with him,) for the respondent.

SHELDON, J. This is a bill in equity brought by the selectmen of the town of Clinton to compel the defendant to carry pupils in the Worcester Normal School, in Holy Cross College,

in the Worcester Business Institute, and in other schools in the city of Worcester, between Clinton and these schools, at one half of the regular fare charged to other passengers. The defendant has succeeded to the property, franchises, liabilities and obligations of the Worcester and Clinton Street Railway Company, through a conveyance from that corporation to the Leominster and Clinton Street Railway Company, and another conveyance from the last named corporation to the defendant. In the grant of location from the selectmen of Clinton to the Worcester and Clinton Street Railway Company, which was accepted by that company on November 9, 1897, is this provision: "Said company further agrees to provide to pupils in attendance upon the public schools, the State Normal School of Worcester, or any school in Worcester, transportation to such pupils at half price while going to and from school."

The main question in this case is as to the validity of this restriction. The defendant contends that its requirement is invalid and unconstitutional, that it creates an arbitrary and unreasonable discrimination between different classes of the travelling public, in violation of articles 6 and 7 of the Declaration of Rights in our State Constitution; and that it violates the provisions of the fourteenth amendment to the Constitution of the United States in that its effect is to deny to the defendant the equal protection of the. laws and to deprive it of its property without due process of law and without just compensation. *Lake Shore & Michigan Southern Railway* v. *Smith*, 173 U. S. 684. But it must first be considered whether the defendant is entitled to raise this question.

It does not expressly appear upon the record when or how the Worcester and Clinton Street Railway Company was organized, but as was stated in *American Steel & Wire Co.* v. *Bearse*, 194 Mass. 596, 600, we have judicial knowledge that it must have been organized under the laws of this Commonwealth, and that its organization was not under a special charter. Having regard to its name and to the fact averred in the bill and admitted in the answer that its location in Clinton was accepted in November, 1897, it is almost a necessary inference that its organization was effected at about that time. But we are not left to inference; for the agreed statement of facts refers to the annual

reports of the board of railroad commissioners. That report, of January, 1899, for the year ending September 30, 1898, shows that this corporation was organized during that year, under the general law.

The general law then in force as to such organizations was contained in Pub. Sts. c. 113, §§ 2, *et seq.* The repeal of § 7 and the amendment of § 8 of this chapter in 1898 did not take effect until October 1, 1898, and we need not consider the new provisions which then became in force. St. 1898, c. 578, §§ 26, 27, 28. See also R. L. c. 112, §§ 2, *et seq.*; St. 1906, c. 463, Part III. §§ 3, *et seq.* Under these sections of Pub. Sts. c. 113, the first thing to be done in the formation of a street railway company was the signing by fifteen or more persons of written articles of association with the intention of forming a corporation as therein provided. The directors named in these articles might then petition the board of aldermen or the selectmen for a location of the tracks of the proposed railway in each of the cities or towns through which the road was to run, and those officers might either refuse such location or grant the same or any portion thereof under such restrictions as they deemed that the interests of the public might require. It was only after such locations under such restrictions, if any, had been granted and accepted within thirty days by the directors named in the articles of association for the projected corporation that the corporation could be established or the first meeting be called. Pub. Sts. c. 113, §§ 7, 8. The section last cited says in terms, " When the track or tracks of the proposed company have been so located, the corporation may be established, and the first meeting shall be called." Manifestly the certificate of incorporation under Pub. Sts. c. 112, § 44, and c. 113, § 8, could not be issued until all these provisions had been complied with, and the fact of such compliance shown to the proper public officers. And it is equally plain that the effect of these provisions was that the granting and acceptance of the locations under such lawful restrictions as might have been imposed by the public officers who had the power to grant the locations and to impose the restrictions were made conditions precedent to the grant of the franchise to be a corporation. They were made the conditions upon which the corporation came into existence and accepted its franchise. If these restrictions

were originally lawful, and if they have not been withdrawn or affected by subsequent modification thereof, the corporation cannot, while it continues to exercise its franchises, complain of their enforcement. It is as if the corporation had been created by a special charter containing the same restrictions. The corporation can raise no question of the constitutionality of a proceeding in accordance with the charter which it was content to accept. Holmes, J., in *Rockport Water Co.* v. *Rockport*, 161 Mass. 279. It has come into being, and has consented to come into being, subject to these restrictions, and cannot be heard to complain of them. *Interstate Consolidated Railway* v. *Massachusetts*, 207 U. S. 79, 84, and cases there cited.

But in what has thus far been said we have been dealing only with lawful restrictions. If in the granting of a location to a projected corporation the public officers who made the grant had sought to impose restrictions which were simply unlawful, either because they required the performance of a forbidden act or because they wholly transcended the scope of the authority of the officers to impose, doubtless such restrictions could not be enforced; and the question how far the grant of the location would be deemed to be valid in such a case is not before us. The general doctrine is that the location would be held to be valid, the attempt to impose an unlawful restriction being a mere nullity. *Keefe* v. *Lexington & Boston Street Railway*, 185 Mass. 183, 185. *Worcester* v. *Worcester Consolidated Street Railway*, 192 Mass. 106. *Fisher* v. *McGirr*, 1 Gray, 1. We do not doubt that the restrictions sought to be enforced in any particular case must be within the general jurisdiction of the municipal officers. But under the legislation in force when these restrictions were imposed the selectmen had the power to deal with the subject of the fares to be charged, by imposing such restrictions thereon as they deemed reasonable and for the public interest; and the acceptance of the location subject to such restrictions by the directors of the proposed corporation and the subsequent creation of the corporation upon such acceptance must be taken to be an admission by the corporation that the restrictions are reasonable and for the public interest, and in popular language might be called, as in reality it would be, a consent or agreement on its part to be bound by them. And this is the doctrine

of our statutes. In Pub. Sts. c. 113, § 45, after provisions in the two preceding sections for regulation .of the rates of fare to be charged by street railway companies, it was enacted that nothing contained in those sections " shall be held to authorize a company or said board [of railroad commissioners] to raise the rate of fare or the price of tickets above the rate or price established for a locality by agreement made as a condition of location or otherwise between a company or its directors and the mayor and aldermen of a city or the selectmen of a town, except by a mutual arrangement with such mayor and aldermen or selectmen." This is a legislative recognition of the right of the local boards to deal under § 7 with the subject matter of fares. And see Sts. 1864, c. 229, § 25 ; 1871, c. 381, § 35 ; 1874, c. 29, § 6. So this court, speaking through the Chief Justice, said that this statute recognized the validity of such agreements, though it was decided that after the enactment of St. 1898, c. 578, § 13, the municipal officers, in granting locations to a street railway company, could not impose a condition regulating and restricting the fares to be charged. But we have already seen that this later statute does not affect the question before us. And the confirmation of prior locations in the last sentence of St. 1898, c. 578, § 13, indicates at least that the validity of such restrictions as are now before us was not intended to be impaired. *Mayor of Worcester* v. *Worcester Consolidated Street Railway*, 192 Mass. 106.

It is doubtless true that the municipal officers, in granting locations and in imposing such restrictions as they·deem to be required by the interests of the public, act as public officers exercising a *quasi* judicial authority, and not as agents of the city or town driving a bargain with the promoters of a projected railway. *Hewett* v. *Canton,* 182 Mass. 220, and cases there cited. *Flood* v. *Leahy,* 183 Mass. 232. Nevertheless, the terms of the locations when accepted by the company impose, as we have already seen, a liability which becomes by virtue of such acceptance something like a contractual liability ; and the Legislature ·, has often spoken of such terms, conditions and restrictions in the grant of locations as contracts, agreements, or stipulations. See besides Pub. Sts. c. 113, § 45, already referred to ; Sts. 1864, c. 229, § 45 ; 1866, c. 286, § 2 ; c. 294 ; 1871, c. 381, § 35 ; 1887,

c. 284, § 5. And the very language by which the restriction now before us was imposed is that of an agreement by the company. In view of the fact that we have found no legislative authority for agreements between the officers of cities or towns and projected street railway companies as to rates of fare to be charged other than was contained in Pub. Sts. c. 113, § 7, and the prior statutes embodied therein, (for § 45 is merely a recognition of an authority already existing,) we feel compelled to the conclusion that in each of these statutes the words "contract," "agreement," "stipulations," and the like, were used in the same sense as in St. 1871, c. 381, § 35, where the words are "by agreement made as a condition of location or otherwise." At least, it is certain that the word "agreement" is used in the statute last cited to include conditions imposed in grants of location; and that is all which need here be maintained. We are of opinion accordingly that the establishment of rates of fare was a subject as to which the selectmen of Clinton, in granting a location, might impose restrictions which would not be unlawful in themselves, and that the street railway company, organized upon the basis of such location and restrictions and its acceptance thereof, could not afterwards be heard to dispute the reasonableness of such restrictions.

Nor is it necessary for us to examine closely into the meaning of the word "locality" as used in Pub. Sts. c. 113, § 45. It is undoubtedly a word of somewhat limited signification. But it has purely a relative meaning. A sufficiently broad sense has been given to it elsewhere to cover the case before us. *State* v. *Fremont, Elk Horn & Missouri Valley Railroad,* 22 Neb. 313, 329, in which the word "locality" in a statute forbidding unjust and unreasonable charges by a railroad company was held to include any "village, city, county, or portion of the State." So the words "local freight" may refer either to shipments from one way station to another, or to freight to be carried wholly within the boundaries of a particular State. *Mobile & Montgomery Railroad* v. *Steiner,* 61 Ala. 559. *Shipper* v. *Pennsylvania Railroad,* 47 Penn. St. 338, 344. We see no reason for limiting the word to any particular city or town, especially since, in the several statutes upon street railways already referred to, the Legislature has used the words "city" or "town" when speaking of the terri-

tory comprised in any one municipal organization. There are cases in which adjacent villages, though situated in different towns or cities, yet have their principal communications and their chief interests in common with each other, so that all their inhabitants would regard both villages as lying in the same district, locality or neighborhood. In this case, we have already seen that the general subject of regulation of fares in a projected street railway might be included in the restrictions to be imposed by the selectmen of a town in granting a location.

But all these matters were and are under the general control of the Legislature, which has full power over the uses to be made of all highways, even though it generally has chosen to exercise this control through town or city officials. *Cheney* v. *Barker,* 198 Mass. 356. *Springfield* v. *Springfield Street Railway,* 182 Mass. 41. *Worcester* v. *Worcester Consolidated Street Railway,* 182 Mass. 49. *Prince* v. *Crocker,* 166 Mass. 347, 359, and cases there cited. In view of these considerations, we are of opinion that the Legislature intended, by the provisions of Pub. Sts. c. 113, §§ 43–45, to give to the board of railroad commissioners power to revise and regulate the fares charged by street railway companies, whether or not fixed in accordance with restrictions imposed by town or city officials, subject to the condition that fares so established " for a locality " should not be raised except by a mutual arrangement with such officials. As no attempt was made to have the rates of fare fixed by the restrictions here in question for pupils of schools revised by the railroad commissioners, we need not determine whether these rates of fare could be said to have been established " for a locality " within the meaning of the statute. These considerations are not affected by the repeal on October 1, 1898, of Pub. Sts. c. 113, §§ 44, 45, and the enactment of St. 1898, c. 578, § 23, itself repealed by St. 1901, c. 180. One effect of the repeal has been to remove from the statutes the reference to fares " for a locality." Nor are they affected by the fact that power to regulate fares is not now vested in the board of railroad commissioners. St. 1906, c. 463, Part III. § 100.

We know of no legislation which has annulled or affected this restriction. As we have already seen, it was confirmed by St. 1898, c. 578, § 13. It was not affected by anything contained

in St. 1887, c. 284, which created the defendant corporation. The burden of complying with it was assumed by the Leominster and Clinton Street Railway Company when it purchased the property and franchises of the Worcester and Clinton Street Railway Company; and by the defendant when it purchased the property and franchises of the Leominster and Clinton Street Railway Company. And nothing in St. 1897, c. 269, (see now St. 1906, c. 463, Part III. §§ 52, *et seq.,*) or in St. 1906, c. 463, Part III. §§ 98, 99, *et seq.,* or in St. 1906, c. 479, or in any other statute, relieves the defendant from the burden which it thus assumed. Certainly nothing in St. 1900, c. 125, can have any such effect.

And it may be added that we do not understand it to be contended that this restriction created any undue burden upon the street railway company when it was first imposed. Neither the defendant's answer nor the agreed facts go further than to state that the charge of half rates yields at present less than the cost of carriage, by reason of the increase in the last six years of the cost of maintaining and operating the defendant's railway. But we can pass only upon the validity of the restriction as originally imposed and assented to by the defendant's predecessor in title and voluntarily assumed by the defendant.

There is nothing in our previous decisions at variance with the conclusion which we have reached. *Keefe* v. *Lexington & Boston Street Railway,* 185 Mass. 183, as we have already seen, and *Selectmen of Wellesley* v. *Boston & Worcester Street Railway,* 188 Mass. 250, turned upon the provisions of St. 1898, c. 578, which materially altered the prior statutes. *Springfield* v. *Springfield Street Railway,* 182 Mass. 41, and *Worcester* v. *Worcester Consolidated Street Railway,* 182 Mass. 49, dealt with extensions of locations granted to already existing corporations, and not, as here, to original locations granted to directors of a corporation in process of formation and subsequently becoming the very basis of the company's corporate existence. This distinction is pointed out in *Hyde Park* v. *Old Colony Street Railway,* 188 Mass. 180. See also *Newcomb* v. *Norfolk Western Street Railway,* 179 Mass. 449, and *Selectmen of Gardner* v. *Templeton Street Railway,* 184 Mass. 294. We have found no case in which restrictions upon an original location granted before

the taking effect of St. 1898, c. 578, and within the general power of the public officials granting them, have been held to be invalid.

Accordingly the majority of the court are of opinion that the question of fares to be charged upon the projected railway was one with which the selectmen might deal in granting a location; that the restriction imposed was within their general power to make ; and that, having been accepted by the defendant's predecessor as one of the conditions upon which it came into existence and acquired its corporate franchises, and having been assumed by the defendant, it is a valid restriction and may be enforced against the defendant. The remarks of Peckham, J., in *Detroit* v. *Detroit Citizens' Street Railway*, 184 U. S. 368, 384, 385, are no less forcible against an attempt by the defendant to evade or annul this obligation than against any attempt that the plaintiffs might have made to render the obligation more onerous.

It remains to determine the extent of the obligation thus imposed, and especially whether it applies to students attending Holy Cross College and the Worcester Business Institute. The defendant is required by its terms " to provide to pupils in attendance upon the public schools, the State Normal School of Worcester, or any school in Worcester, transportation . . . at half prices while going to and from school."

The word " schools " is undoubtedly one of broad signification, and sometimes it may appear, by the connection in which it is used, to include higher institutions of learning. *Commonwealth* v. *Porter*, 1 Gray, 476, 477. *University* v. *People*, 99 U. S. 309, 324. *American Asylum* v. *Phœnix Bank*, 4 Conn. 172. *In re Sanders*, 53 Kans. 191, 197, 198. *Omaha Medical College* v. *Rush*, 22 Neb. 449. But ordinarily and without something to indicate that a wider meaning was intended to be given to this word, it will not be taken to include such higher institutions of learning as colleges or universities, or institutions for the teaching of trades, professions or business. *Commonwealth* v. *Connecticut Valley Street Railway*, 196 Mass. 306. *Chegaray* v. *Mayor of New York*, 13 N. Y. 220. *Lichtentag* v. *Tax Collector*, 46 La. Ann. (Part I.) 572. The same distinction is observed in our Constitution, c. 5, § 1, arts. 1, 2, and in our legislation. R. L. c. 39, *et seq.* Accordingly it was held in

*Commonwealth* v. *Connecticut Valley Street Railway, ubi supra,* that a commercial college in Northampton was neither a public nor a private school within the meaning of St. 1906, c. 479. That institution upon the agreed facts was of substantially the same character as the Worcester Business Institute. Moreover, here, as in the case last cited, the restriction is one for the benefit of "pupils," not of students; and as there stated, "the word 'pupils,' by derivation and the definition of lexicographers, is properly applicable to children and youth. Students in colleges and professional schools are not called pupils." There is nothing inconsistent with this in *State* v. *Leighton,* 35 Maine, 195, or *State Board of Pharmacy* v. *White,* 84 Ky. 626. Neither Holy Cross College nor the Worcester Business Institute can fairly be held to come within the language of the restriction before us; and the students attending those institutions are not pupils within its correct construction.

The defendant has seemed to consider that this question is decisive of the case, and the language of the agreed statement of facts, if that were all, would bear out this contention. But the ninth paragraph of the bill avers that the defendant violates the restriction as to pupils attending the Worcester Normal School as well as the other institutions named; this is admitted in the first paragraph of the answer; and the facts agreed are expressly stated to be "in addition to the facts alleged in the bill and admitted in the answer." We do not understand, however, that any question is now made as to pupils or students attending the preparatory department of Holy Cross College.

Accordingly, a mandatory injunction should be issued requiring the defendant to provide to pupils in attendance upon the State Normal School of Worcester transportation between Clinton and said school, at one half the regular fare while going to and from school.

<div align="right">

*So ordered.*