BOSTON CONSOLIDATED GAS COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES.

Suffolk. February 5, 1947. — April 10, 1947.

Present: FIELD, C.J., QUA, RONAN, & SPALDING, JJ.

*Public Utilities. Gas Company. Administrative Board or Officer.*

The department of public utilities was without power so to construe an unambiguous order made by it four years before as to give it a meaning different from its plain terms, and to direct a gas company to file a schedule which was in accordance with such construction but was at variance with the plain terms of the order.

A final order of the department of public utilities which is not ambiguous either in its wording or in its application to the subject matter cannot be interpreted by resort to the course of the proceedings which led to its entry.

The department of public utilities had no power, without proceedings under G. L. (Ter. Ed.) c. 164, § .93, to make an order directing a gas company, which had filed a schedule conforming to an order previously made by the department and still in force, to file a new schedule in effect stating lower rates for customers.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on July 30, 1946.

The case was reserved and reported by *Wilkins*, J.

*R. H. Holt*, (*A. P. Schmidt* with him,) for the plaintiff.

*C. A. Barnes*, Attorney General, & *G. P. Drury*, Assistant Attorney General, for the defendant.

*T. D. Lavelle* & *C. J. Moynihan*, by leave of court submitted a brief as amici curiae.

QUA, J. This is a bill in equity brought under G. L. (Ter. Ed.) c. 25, § 5, by a gas company, herein called the company, engaged as a public utility in the sale of gas, to have annulled certain rulings of the department of public utilities and an order of that department requiring the company to file with the department a rate schedule, to be effective August 1, 1946, setting forth a fuel charge "to which reference and application may be made by various other schedules" and which should expressly provide, in substance, that the fuel charge should increase the price of gas to customers of the company only as the price of gas purchased by the company under a certain contract with Eastern Gas and Fuel Associates, hereinafter called Eastern, should be correspondingly increased by the application of a similar fuel charge in that contract.

It will be necessary to state in brief outline the history of this fuel charge as it appears from the documentary evidence of proceedings before the department. On April 24, 1942, the company entered into a contract with Eastern for the purchase of gas by the company up to the amount of its daily requirements. In this contract was included a fuel charge which, as later amended at the instance of the department, provided, so far as here material, for an addi-

tional charge to the company of one mill per thousand cubic feet of gas for each two and one half cent increase in the cost of coal at Eastern's plant above $5.78 a ton. On the following day, April 25, 1942, the company filed with the department pursuant to G. L. (Ter. Ed.) c. 164, § 94, as amended by St. 1939, c. 178, § 1, schedules of rates and charges for gas to be sold and delivered to the public, including a schedule known as "M. D. P. U. No. 99," in the form of a fuel charge to consumers. This schedule pro- vided that whenever the price for gas purchased by the company under its contract with Eastern should be "in- creased by application of the fuel charge in such contract, then the price of all gas sold to consumers . . . [should] be increased" by an amount directly related to the increase in the price of gas under the fuel charge in the contract. On June 30, 1942, after investigation and hearing, the department, under authority of St. 1903, c. 417, § 6, ap- proved the amended contract, to become effective June 1, 1942, and to continue in force until six months after the termination of hostilities or until otherwise terminated as provided in the order. On the same day the department, under authority of G. L. (Ter. Ed.) c. 164, § 94, as amended, entered an order disallowing the company's proposed sched- ule "M. D. P. U. No. 99" and requiring the company to file a new schedule (known as "M. D. P. U. No. 100") which should set forth a fuel charge to consumers, the precise wording of which was prescribed in the order. By this word- ing the price of all gas sold to consumers was to "be in- creased one tenth mill ($.0001) per one hundred (100) cubic feet for each whole two and one half cents ($.025) by which the cost of coal exceeds five and 78/100ths dollars ($5.78) per gross ton," and the "cost of coal" was to be the average cost delivered at "the plant of the producer from whom the company purchases the major portion of all gas sold by it," that is to say, at the plant of Eastern. It will be observed that, although by the fuel charge submitted by the company in its proposed schedule "M. D. P. U. No. 99" the price of gas to consumers was to be increased whenever the price of gas to the company was increased by the application of

the fuel charge in its contract with Eastern, the fuel charge required.. by the department in schedule "M. D. P. U.. No. 100" contained no such provision, but in lieu thereof provided in effect for an increase to consumers dealing with the company predicated simply upon an increase in the cost of coal to Eastern. Out of this difference the present controversy arises.

The company duly filed schedule "M. D. P. U. No. 100," containing the fuel charge exactly as prescribed by the department. This went into effect July 1, 1942. After that date the company applied the fuel charge to gas sold by it. Eastern, however, did not apply the fuel charge in its contract with the company to purchases of gas by the company from it; and the company, although it received the benefit of the fuel charge of schedule "M. D. P. U. No. 100" in its dealings with its customers, did not pay a corresponding increase in the price of gas purchased by it. This, as stated in the bill and admitted by the answer, was "because the collection and payment of the fuel charge [in the contract between Eastern and the company] was forbidden by the regulations of the Office of Price Administration of the United States under the emergency price control act of 1942." 56 U. S. Sts. at Large, c. 26.

.: On:.March..15, 1946, twenty or more customers of the company filed a petition with the department, which as amended alleged, among other things, that the order of the department of June 30, 1942, increasing the rates to customers by adding the fuel charge required to be filed in schedule "M. D. P. U. No. 100" was based upon the premise that the company should be allowed to transmit to its customers increases in the price of gas purchased by the company under its contract with Eastern, and that in fact there had been no such increases. The petition prayed that the order of June.30, 1942, be revoked, and that the company be required to account for all moneys received from its customers as a fuel charge and to refund such moneys to its customers. The department on April 25, 1946, also instituted an investigation on its own motion under G. L. (Ter. Ed.) c. 164, § 93, of the price of gas sold

by the company "so far as relates to charges made to its customers under" the fuel charge. Both proceedings were heard together. It is to errors in rulings and orders made in connection with this hearing that the present bill in equity is addressed.

In its opinion, dated July 24, 1946, the department attempted to construe its former order of June 30, 1942, wherein it had directed the company to file schedule "M. D. P. U. No. 100," in which the fuel charge was expressed to be based merely upon the price of coal to Eastern, as if it had provided that the fuel charge be based upon the price paid by the company to Eastern for gas, as had been provided in the fuel charge of the originally proposed schedule "M. D. P. U. No. 99," which the department had disallowed. In its 1946 opinion the department reviewed the proceedings hereinbefore outlined and referred to statements in the former opinion which had accompanied its 1942 order to the effect that it was not unreasonable or unjust that the proposed fuel charge in the contract between Eastern and the company "should in turn be transmitted through the means of an appropriate fuel charge to the customers" of the company; that "to that end a reasonable fuel charge should be provided in the schedules of the . . . [company] to recover a fair and equitable portion of the increment cost of coal which may be justly allocated to gas manufactured"; and that "it is recognized that the cost of fuels to the company manufacturing gas [Eastern] has substantially increased during the past six months due to the conditions arising from the war, and that the proposed increase in cost to the . . . [company] should properly be transmitted to the consumers of gas at the earliest possible date to preserve and maintain the service and efficiency of the . . . [company]." The department in its 1946 opinion found and ruled that the collections made by the company from its customers as fuel charges under the allowed schedule "M. D. P. U. No. 100"[1] were "unauthorized and not in conformity with our order."

---

[1] These collections during 1942–1945 were said by the department to amount "by the company's own estimate" to $1,284,246.

It found that, although the fuel clause in that schedule did not explicitly refer to the fuel clause in the contract with Eastern, it was nevertheless "predicated upon the contract fuel clause and was intended to operate as a means of transmitting to and collecting from customers amounts that the company might have to pay to Eastern under the contract fuel clause." The department ruled that in the 1946 proceedings it would not consider the general subject of the propriety of the rates now charged, that subject being beyond the scope of the proceedings, and found that no evidence had been offered "which had the slightest tendency to show that the actual rates contained either in the contract fuel clause or the customers' fuel clause are in any way unjust or improper or ought now to be disallowed." Although the department disclaimed any power to decree reparation to the customers or "to make any order retroactively affecting the company's rates," it did on July 24, 1946, purportedly as a mere clarification of its order of June 30, 1942, enter an order requiring the company to file with the department, to be effective August 1, 1946, a schedule setting forth a fuel charge the express terms of which were prescribed in the order and the effect of which would be to allow the company to make a fuel charge to its customers only if the price of gas to the company should be increased by the application of the fuel charge in its contract with Eastern and not merely in accordance with increases in the price of coal to Eastern which did not actually increase the price of gas to the company.

The department's construction of its 1942 order in its 1946 opinion was erroneous in law. The 1942 order establishing the consumers' fuel charge "M. D. P. U. No. 100" was perfectly plain in the form in which it was adopted June 30, 1942. By its words, when given their commonly accepted meaning, it made the cost of coal to Eastern and not the price of gas to the company the test of the company's right to a fuel charge against its customers. This was a test perfectly possible of practical application. It might well have been expected at the time to produce in the long run a result substantially the same as if the price

of the gas had been taken as the test. There might even have been reasons for preferring it. The order of June 30, 1942, was not ambiguous either in its wording or in its application to the subject matter. Although, like other documents, it must be read in its setting, its plain words could not be explained away or given a meaning they were incapable of bearing, nor could its substance be altered four years later by reverting to the course of the proceedings and to the discussion and reasons which had preceded the entry of the 1942 order, whatever these might be thought to show as to the intent of the department at that time. The very object of entering a final order in a proceeding before a public board or a final decree in court litigation is to embody and integrate in a single statement the final completed result of all that has gone before. To that final order or decree and, in the absence of genuine ambiguity, to that alone the parties have a right to look to ascertain their rights and duties. They are not obliged to look behind it. They may shape their conduct in accordance with it, secure in the reliance that it cannot be changed to their disadvantage under the guise of interpretation, even though events not anticipated when it was entered may produce an effect different from that intended. As applied to judicial proceedings, these propositions are fully supported by authority either expressly or by clear implication. *Cooper v. Owen,* 230 Ala. 316, 318. *First National Bank v. Mulich,* 83 Col. 518. *Craig v. Bennett,* 158 Ind. 9, 12–14. *Judge v. Powers,* 156 Iowa, 251, 256. *Butt v. Herndon,* 36 Kans. 370, 372. *Hopper v. Arnold,* 74 Kans. 250. *Martin v. Evans,* 85 Md. 8, 13–14. *Adams v. Yazoo & Mississippi Valley Railroad,* 77 Miss. 194, 266, 304. *Davis v. Baum,* 192 Okla. 85. *State v. Gray,* 42 Ore. 261, 268–269. *Sheffield v. Goff,* 65 Texas, 354, 358. *In re Brown's Guardianship,* 6 Wash. (2d) 215. *Moehlenpah v. Mayhew,* 138 Wis. 561, 577. *Rogers v. Hill,* 289 U. S. 582, 587. *Commissioner of Internal Revenue v. Estate of Bedford,* 325 U. S. 283. *Eckerson v. Tanney,* 235 Fed. 415, 418. *Wright v. Gibson,* 128 Fed. (2d) 865. *Baxter v. Dallas Levee Improvement District,* 131 Fed. (2d) 434. *McGhee v. Leitner,* 41 Fed. Sup. 674, 676.

See cases in 33 C. J., Judgments, 1052–1054. In various cases involving the decisions of officers and boards the sharp distinction is illustrated between the actual order and the findings, rulings, or reasoning on which it rests. *Helvering* v. *Gowran*, 302 U. S. 238, 245–246. *Securities & Exchange Commission* v. *Chenery Corp.* 318 U. S. 80, 88. *Federal Power Commission* v. *Hope Natural Gas Co.* 320 U. S. 591, 602. *American Motorists Ins. Co.* v. *Central Garage*, 86 N. H. 362. *Carolina Aluminum Co.* v. *Federal Power Commission*, 97 Fed. (2d) 435. See *Broderick's Case*, 320 Mass. 149. It follows that with public boards as with courts it is the final order that governs.

The many cases cited by the Attorney General in behalf of the defendants holding that related documents must be construed together and that all parts of a statute or of a group of related statutes, or of a contract or a will must be considered on questions of construction are not in point. His argument fails to give sufficient weight to the special nature of a final order or decree as distinguished from all other matter connected with a proceeding, whether found on the same sheet of paper or elsewhere. And the final and binding nature of the order as determinative of rights as long as it remains in force is in no manner impaired by the fact that rate making is in general considered to be a legislative function delegated to the rate making authority rather than a judicial function. See *American Employers' Ins. Co.* v. *Commissioner of Insurance*, 298 Mass. 161, 169; *Arizona Grocery Co.* v. *Atchison, Topeka & Santa Fe Railway*, 284 U. S. 370, 386. It is the actual order of the tribunal and not the reason given for it that constitutes the "legislation." A statute that is not equivocal in its words cannot be interpreted by resort to its legislative history. *Allen* v. *Commissioner of Corporations & Taxation*, 272 Mass. 502, 508. *D. N. Kelley & Son, Inc.* v. *Selectmen of Fairhaven*, 294 Mass. 570, 576. The fuel charge fixed by the 1942 order could be changed and amended only by the equivalent of new legislation which must be brought about strictly in accordance with the procedure laid down in the enabling statute under which the department must act.

G. L. (Ter. Ed.) c. 164, § 93. *Arizona Grocery Co.* v. *Atchison, Topeka & Santa Fe Railway,* 284 U. S. 370, 389–390.

This brings us at once to the consideration of another and more comprehensive reason which rendered the order of July 24, 1946, erroneous in law. The order of June 30, 1942, prescribing a fuel charge dependent upon the price of coal to Eastern was the fixing of rates for gas to the consumer under authority of G. L. (Ter. Ed.) c. 164, § 94, as amended. The rates were those set forth in the approved schedules plus the prescribed fuel charge. See *Boston* v. *Edison Electric Illuminating Co. of Boston,* 242 Mass. 305, 309; *Grant* v. *Department of Public Utilities,* 279 Mass. 38, 48. Those rates will remain in force until changed in accordance with either c. 164, § 93, or c. 164, § 94, as amended. We need not consider whether the department had any jurisdiction to enter any new order merely interpreting or clarifying the order of June 30, 1942, or what, if anything, would be accomplished by doing so, since the order of July 24, 1946, although treated by the department as merely a clarifying order, was not such in fact. The order of July 24, 1946, if valid, changed the underlying basis of the fuel charge from the cost of coal to Eastern to the cost of gas to the company. In substance and effect it was an attempt to fix a new and lower rate for gas to the consumer.[1] The department could fix a new and lower rate for gas to the consumer only by proceeding in accordance with the statute under which it derived its authority to act, G. L. (Ter. Ed.) c. 164, § 93. That section required the department to give a public hearing to the company, and that provision of course required it to hear and consider all evidence pertinent to the issue of what would be a just and reasonable rate for gas to the consumer. *National Dock & Storage Warehouse Co.* v. *Boston & Maine Railroad,* 227 Mass. 197, 201–202. See *Boott Mills* v. *Board*

---

[1] The order of July 24, 1946, would have effected a reduction in the price of gas to the consumer below the price currently being charged by the company under the 1942 fuel charge until such time as O. P. A. regulations should no longer prevent Eastern from applying the fuel charge in its contract with the company. The O. P. A. regulations affecting the sale of gas by Eastern were not lifted until November 10, 1946. See Supplementary Order No. 193, issued November 12, 1946, included in stipulation of the parties.

*of Conciliation & Arbitration,* 311 Mass. 223, 226–227; *Interstate Commerce Commission* v. *Louisville & Nashville Railroad,* 227 U. S. 88, 91; *Chicago Junction Case,* 264 U. S. 258, 265; *Southern Railway* v. *Virginia,* 290 U. S. 190, 195–196; *Morgan* v. *United States,* 298 U. S. 468, 479–481. But the department, being committed to the theory that it was only clarifying its former order, and believing that the scope of the proceedings before it did not extend beyond the fuel charge, declined to give any consideration to evidence of general increased operating costs to the company during the war years since 1942. The result is that if the department's order of 1946 should stand, the company's rates for gas sold to consumers would in reality have been reduced without regard to items of cost that may have risen substantially and that must be taken into account in fixing any new rate. It is no answer to this objection to say that the company could have filed a new schedule of higher rates at any time under § 94, as amended. The company was not required to seek any increase in rates if it felt that it could get along under the rates as they were, including the fuel charge as fixed by the 1942 order. If the form of the proceedings before the department was too restricted to permit it to make the full investigation legally necessary, it should have refrained from making what, if valid, would amount to an order reducing rates until it had before it a proceeding broad enough to enable it to deal properly with a rate case.

It follows from what has been said that the department's finding and ruling that the collections made by the company from its customers as fuel charges under schedule "M. D. P. U. No. 100" were unauthorized and not in conformity with that order were also erroneous, since it is plain on the documentary proof that they were proper charges under "M. D. P. U. No. 100," [1] and that the company could lawfully make such collections. Indeed, it would seem that by the provisions of G. L. (Ter.

---

[1] The department in its findings and rulings was dealing with the right of the company to collect fuel charges in general. There was no issue as to the calculation of particular sums charged.

Ed.) c. 164, § 94, as amended, it was obliged to make them.

At the hearing before the single justice of this court certain evidence, consisting of transcripts of the evidence introduced before the department and exhibits there used, was admitted over the objection of the defendants, and the question of the competency of this evidence is reported. Without implying that any of this evidence was not competent in some aspect of the case, it is enough to say that the errors above mentioned appear as matter of law from the findings and rulings of the department and from documentary evidence the competency of which is not challenged; that we have found no occasion to use the disputed evidence; and that in any event its admission was harmless.

Because the errors of law hereinbefore set forth affect as a whole the order of the department of July 24, 1946, directing the company to file on or before August 1, 1946, "an appropriate schedule" for a fuel charge in the words prescribed in said order, a final decree is to be entered in this suit annulling said order. G. L. (Ter. Ed.) c. 25, § 5.

*So ordered.*