NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY *vs.*
CITY OF BROCKTON.

Plymouth. February 8, 1955. — June 8, 1955.

Present: QUA, C.J., RONAN, WILKINS, & COUNIHAN, JJ.

*Telephone Company. Public Utilities. License. Municipal Corporations,*
Officers and agents.

The mayor and aldermen of a city, in granting as public officers locations in public ways to a telephone company in 1895, were not authorized by St. 1880, c. 83, or ordinances adopted thereunder, or by Gen. Sts. c. 64, to insert in such grant provisions requiring the company to furnish telephone service to the city at a discount from the regular rates, and such provisions were void and did not bind the company although it accepted and used the locations so granted.

BILL IN EQUITY, filed in the Superior Court on December 1, 1952.

The suit was heard by *Pecce, J.*

---

[1] The record stated that in his claim for compensation filed on October 15, 1952, the employee set forth that "on July 10, 1952, an irritating substance used during the course of his employment caused an injury which resulted in the removal of his left eye." — REPORTER.

*Charles C. Cabot,* (*Charles Ryan* with him,) for the plaintiff.

*Ovide V. Fortier,* (*Hugh F. Blunt & Samuel Smolensky,* City Solicitor, with him,) for the defendant.

RONAN, J.    This is an appeal from a final decree entered in a proceeding for a declaratory decree under G. L. (Ter. Ed.) c. 231A, inserted by St. 1945, c. 582, § 1, adjudging that the telephone company is obligated to continue to furnish telephone service to the city at a discount of seventy-five per cent from its regular rates, and that the city, having paid at the reduced rates, did not owe the company the difference between the regular rates and the discount rates since April 1, 1949, notwithstanding a notice seasonably given by the company that it would charge it at the regular rates since the last mentioned date.

The company has formally waived any claim for the difference between the regular rates and the reduced rates which had accrued when the bill was filed, and so there is left open for our consideration the single issue whether the company is entitled to charge the city the regular rates.    The suit was heard upon a statement of agreed facts.

The plaintiff has succeeded to the franchises, privileges, rights, and obligations of the Southern Massachusetts Telephone Company.    The petition of the latter company to place underground conduits in certain streets in the defendant city was granted October 21, 1895, by an order approved by the mayor and aldermen.    Among the provisions of the grant were the following: "Said Company shall furnish to said city all such telephones as it shall require, at a discount of seventy-five percent from its regular rates . . . .    Said company shall not increase its charges for telephone rentals within the city above the existing rates, viz; six dollars per month for 'long distance' and five dollars per month for 'Blake transmitter.'    Said company shall file with the City Clerk a written acceptance of the provisions of this Order within thirty days of the date of the adoption hereof, otherwise this Order shall be null and void."

At the time of the passage of this order St. 1880, c. 83

(see now G. L. [Ter. Ed.] c. 166, § 25, as revised by St. 1951, c. 476, § 2), was in effect and it authorized the city council of a city to establish by ordinance reasonable regulations for the erection and maintenance of all telegraph and telephone lines and to cause the removal of lines constructed or maintained in violation of such regulations. Pursuant to this statute the city had adopted ordinances (see now cc. 21, 29, in the 1899 revised ordinances) requiring the filing of plans showing the location of poles and underground conduits and regulating the construction and maintenance of underground conduits, cables, and wires. One of these ordinances, c. 29, § 1, provided that the board of mayor and aldermen may grant authority to construct underground conduits, cables, and wires "under such conditions, restrictions and limitations as the said board may impose to be expressed in the license or permit." The company accepted the locations, installed the underground conduits included in the grant, and filed a written agreement as required by an ordinance regulating the laying and maintenance of underground cables, wires, and manholes, and the erection and maintenance of poles. Subsequent applications for an extension of the underground system were filed by the company and granted by the mayor and aldermen of the city, and similar agreements were filed by the company. None of these written agreements provided for telephone service at discount rates. An indemnity bond to secure the city against claims for damage arising out of the work done under the grants was first filed by the company on September 22, 1899, and thereafter several bonds were filed evidently in compliance with the ordinance. Without further discussion it is enough to say that the mayor and aldermen in granting locations were acting as public officers under a delegation of power from the Legislature and not as agents of the city. *Springfield* v. *Springfield Street Railway*, 182 Mass. 41. *Worcester* v. *Worcester Consolidated Street Railway*, 182 Mass. 49, affirmed 196 U. S. 539. *Flood* v. *Leahy*, 183 Mass. 232. *Lynch* v. *Lowell Electric Light Corp.* 263 Mass. 81. *Carroll* v. *Cambridge Electric Light Co.* 312

Mass. 89.   The ordinances cannot go beyond the scope of the enabling statute.   There was nothing in St. 1880, c. 83, giving the municipal board any rate making power.   *Commonwealth* v. *Hayden*, 211 Mass. 296.   *Kilgour* v. *Gratto*, 224 Mass. 78.   *Borggaard* v. *Department of Public Works*, 298 Mass. 417.   *Commonwealth* v. *Rivkin*, 329 Mass. 586.

The statute, St. 1880, c. 83, is unlike Pub. Sts. c. 113, codifying the previous statutes, to wit, St. 1871, c. 381, and St. 1874, c. 29, regulating the grants of location to street railways, for c. 113 contained one section that such grants may be made "under such restrictions as they deem the interests of the public may require" (§ 7), and another section provided that the rate making power given to the directors of a street railway company subject to regulations by the board of railroad commissioners shall not be construed "to authorize a company or said board to raise the rate of fare or the price of tickets above the rate or price established for a locality by agreement made as a condition of location" (§ 45).[1]   We are of opinion that c. 113 is much broader than St. 1880, c. 83, and that the former confers the right to fix fares while the latter is confined to establishing the location of equipment.   Furthermore, St. 1880, c. 83, § 3, indicates that "its provisions were intended to attach by way of amendment to the general law touching telegraph companies, then found in Gen. Sts. c. 64," *Metropolitan Home Telephone Co.* v. *Emerson*, 202 Mass. 402, 407, and there is nothing contained in said c. 64 authorizing a municipal board to prescribe rates.   The subsequent legislative history and decisions withdrawing from local officers the power to establish fares and other conditions in granting locations to street railway companies need not be detailed.[2]   We are of opinion that the mayor and aldermen

---

[1] See *Selectmen of Clinton* v. *Worcester Consolidated Street Railway*, 199 Mass. 279; *Selectmen of Westwood* v. *Dedham & Franklin Street Railway*, 209 Mass. 213.

[2] See *Keefe* v. *Lexington & Boston Street Railway*, 185 Mass. 183; *Selectmen of Clinton* v. *Worcester Consolidated Street Railway*, 199 Mass. 279, 286; *Board of Survey of Arlington* v. *Bay State Street Railway*, 224 Mass. 463; *Fall River* v. *Public Service Commissioners*, 228 Mass. 575.

had no authority to fix the telephone rates in granting the first and subsequent locations to the company.

The city acting in a proprietary capacity could purchase such telephone services as were reasonably necessary for the proper conduct of its municipal affairs, and the company could deal with the city, as it obviously did for more than a half century, presumably under the belief that it was under an obligation to furnish telephone service at the reduced rates or, as the company concedes, it may have been wrong in extending to the city the discount since the passage of St. 1913, c. 784. Both parties were acting in good faith. It can hardly be said that both parties did not recognize the existence of an arrangement of some sort between themselves, however the arrangement may be termed, until the company notified the city that commencing April 1, 1949, it would charge regular rates. In a different situation, it was said in *Selectmen of Clinton v. Worcester Consolidated Street Railway*, 199 Mass. 279, 286, with reference to the validity of conditions attached to the granting of a street railway location, that "the terms of the locations when accepted by the company impose, as we have already seen, a liability which becomes by virtue of such acceptance something like a contractual liability; and the Legislature has often spoken of such terms, conditions and restrictions in the grant of locations as contracts, agreements, or stipulations." The city in respect to the permanency of the rates, even if it had a contract, would not stand any better than any other customer of the company. "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter." *Hudson County Water Co. v. McCarter*, 209 U. S. 349, 357. *Hamer v. Nashawena Mills, Inc.* 315 Mass. 160, 166.

The city, however, does not now contend that the order granting the location in 1895 constituted a contract between it and the company, but maintains that the restriction fixing the rates to be charged to it is valid. We have

already pointed out that such restriction was void. Grants of locations were valid and the rate restriction imposed after St. 1898, c. 578, § 13, withdrawing from local boards the right to fix fares as a condition to the granting of a location, was of no force and effect. *Keefe* v. *Lexington & Boston Street Railway*, 185 Mass. 183, 185. It was said in *Selectmen of Clinton* v. *Worcester Consolidated Street Railway*, 199 Mass. 279, 285, that "The general doctrine is that the location would be held to be valid, the attempt to impose an unlawful restriction being a mere nullity," and in *Treasurer & Receiver General* v. *Revere Sugar Refinery*, 247 Mass. 483, 491, that "The general doctrine is that conditions and terms inserted in a license by a public board not authorized or warranted by law are void. Even express acceptance of them by the licensee has been held to be ineffectual." That principle governs the instant case and strikes down the restriction which the defendant contends is lawful. Indeed, it seems to have been the precise purpose sought to be accomplished by St. 1943, c. 11, to validate the plaintiff's locations and those of other public service companies previously granted in the streets of Brockton so far as they pertained to wires, poles, abutments, conduits and other physical equipment of these companies, then situated above, on, or under the streets of the defendant city.

The public policy of the Commonwealth relative to common carriers, including telephone companies, was greatly changed by St. 1913, c. 784, which became effective on July 1, 1913. By this chapter the name of the board of railroad commissioners was changed to the public service commission (now department of public utilities) and its membership was increased. General supervision and regulation of, and jurisdiction and control over, common carriers furnishing supplies or rendering services to the public within the Commonwealth were conferred upon this State board. One of its principal functions was to determine fair and reasonable charges to be made by the carrier and to enforce the charges. The great variety and wide scope of the matters entrusted to the department may be illus-

trated by a few citations. *Boston* v. *Edison Electric Illuminating Co. of Boston,* 242 Mass. 305. *Gurney Heater Manuf. Co.* v. *New . York, New Haven & Hartford Railroad,* 264 Mass. 427. *Salisbury* v. *Salisbury Water Supply Co.* 279 Mass. 204. *Wyatt* v. *Boston Consolidated Gas Co.* 319 Mass. 251. *Boston Consolidated Gas Co.* v. *Department of Public Utilities,* 321 Mass. 259. *Wilkinson* v. *New England Telephone & Telegraph Co.* 327 Mass. 132. *Sullivan* v. *Boston Consolidated Gas Co.* 327 Mass. 163. *A. B. & C. Motor Transportation Co. Inc.* v. *Department of Public Utilities,* 329 Mass. 719.

We will briefly discuss some of the provisions of this chapter when we reach the different contentions of the parties.

The rate making power over carriers is an inherent attribute of the sovereignty of the State, and while it can be delegated to a local body the power to fix rates and the exercise of that power by local boards are subject to the authority of the State in the exercise of the police power to modify or annul the arrangements made between the local board and the public utility. *Board of Survey of Arlington* v. *Bay State Street Railway,* 224 Mass. 463. *Fall River* v. *Public Service Commissioners,* 228 Mass. 575. It was deemed best to supersede the system of having locations granted by the local boards in the various communities with different conditions attached thereto, and to have the system of common carriers within the Commonwealth administered by a State board, thus insuring uniformity in all matters connected with common carriers including the transportation of persons or property by railroads, street railways, electric railroads, steamships, express . service or car service, the transmission of intelligence by electricity by means of telephone or telegraph lines, or any other system of communication.

One of the salient features of St. 1913, c. 784, is contained in § 17 (G. L. [Ter. Ed.] c. 159, § 17) which provides that all charges made by carriers shall be just and reasonable · and shall be collected by the carriers, and that every unjust

or unreasonable charge is prohibited and declared unlawful, "but charges heretofore established and set out in any schedule filed as hereinafter provided shall be deemed prima facie lawful until changed or modified by the commission . . . ." The Brockton cut rate never having been scheduled did not come within this provision. The plaintiff contends that a discount of seventy-five per cent from regular rates is unreasonable and discriminatory against the other customers who must in the aggregate pay more in order to enable the company to earn a fair return upon its rate base. The department had authority to fix a fair and reasonable rate between the parties if the matter had been presented to it. The department by an order dated March 18, 1949, respecting "Withdrawal of the Municipal Classification heretofore contained in said M. D. P. U. No. 6" and effective April 1, 1949, permitted the company to withdraw the discount rates previously given to various cities and towns and amounting to thirty-three and one third per cent or one free telephone for each two thousand of population. The company does not contend that this order includes the Brockton discount. That specific matter seems never to have been presented to the department.

Section 18 of c. 784 (G. L. [Ter. Ed.] c. 159, § 15) prohibits the giving of any free service with certain exceptions one of which is that the company shall not be prohibited, "unless the commission [now department] shall otherwise order, from giving service at reduced rates to the commonwealth or to any city or town. . . ." The department stated in a report, "It would appear from the language of this statute [§ 18 of c. 784, now G. L. (Ter. Ed.) c. 159, § 15] that while we may prohibit a municipal classification, we cannot compel the company to afford one. The initiative rests with the company in this respect, and if its management chooses not to grant such a discount, we cannot insist that such discount be made available." In other words, the department has properly construed this section as giving it authority to prohibit but not to compel the granting of a reduced rate to the Commonwealth or to a

city or town.  The company, not being bound to continue the cut rate, could withdraw it and such was the effect of its notice that on and after April 1, 1949, the city would be charged the regular rates.  The city does not contend that regular rates for telephone service have not been lawfully established for the area in which the city is located.

The second paragraph of the final decree adjudicating that the city is not indebted to the plaintiff for the past difference between the regular rates charged and twenty-five per cent of the regular rates paid by the city may stand as the plaintiff has formally waived any decision upon this branch of the case, but the first paragraph of the decree adjudicating that the plaintiff is bound to continue to furnish telephone service to the city in accordance with the order of October 21, 1895, is reversed and there is to be substituted therefor the following: The plaintiff is under no obligation to furnish telephone service to the city of Brockton other than at the regular rates established for service similar to that furnished to said city.  The third paragraph awarding costs against the company is reversed and there is to be substituted a new paragraph awarding costs to the company.  The decree as modified is affirmed with costs of this appeal.

*So ordered.*